1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE STILLAGUAMISH TRIBE OF
INDIANS,

                            Plaintiff,

        v.

DAVID L. NELSON, et al.

                            Defendants.

CASE NO. C10-327 RAJ

ORDER

## I.      INTRODUCTION

This matter comes before the court on motions for summary judgment by defendants David and Michele Nelson ("Nelson") (Dkt. # 283) and defendant Nathan Chapman (Dkt. # 296).[1]  The Tribe opposes the motions.  The remaining claims against Nelson and Chapman (collectively, "Defendants") are (1) conspiracy to violate the

---

[1] The Nelson Defendants and Chapman have each filed a notice of joinder in the other's summary judgment motion.  Such joinder is an apparent attempt to circumvent this District's 24-page limit rule on motions for summary judgment.  Local Rules W.D. Wash. CR ("LCR") 7(e)(3).  Nevertheless, the court did grant plaintiff The Stillaguamish Tribe of Indians' (the "Tribe") motion for leave to file one consolidated 40-page opposition, as opposed to two 24-page oppositions.  Even though neither Nelson nor Chapman filed a motion for leave to file excess pages, given the overlapping facts, the court will allow the joinder this time.  Such attempts to exceed the page-limits in the future will not be entertained.  The court declines the Nelsons' attempt to incorporate by reference arguments made in their motion to dismiss.  Dkt. # 296 at 1.

1  Racketeer Corrupt and Influenced Organizations Act ("RICO") (second cause of action[2]);

2  (2) violation of RICO section 1962(c) (third cause of action); (3) conspiracy to violate

3  RICO section 1962(c) (fourth cause of action[3]); (4) breach of fiduciary duties and

4  violation of statutory obligations (seventh cause of action); (5) fraud and/or negligent

5  misrepresentation (ninth cause of action); (6) civil conspiracy (tenth cause of action); and

6  (7) unjust enrichment (eleventh cause of action).  Dkt. # 190 (Third Am. Compl.

7  "TAC").[4]

8          Chapman argues that the Tribe lacks standing to bring the RICO claims and that

9  once the RICO claims fail, so do the remaining claims.  Dkt. # 283.  Nelson argues that

10 the Tribe lacks standing to bring the RICO claims, that the statute of limitations bars each

11 remaining claim, and that a failure of proof requires dismissal on each remaining claim.

12 Dkt. # 296.  On January 31, 2013, the court ordered the parties to provide the court with a

13 spreadsheet identifying the evidence in the record that supported various arguments made

14 by the parties.  Dkt. # 381.

15

16

17

18  _____

19      [2] The first and second causes of action for violation of RICO and conspiracy to violate
RICO arise from defendants' operation of the smoke shop.

20      [3] The third and fourth causes of action for violation of RICO and conspiracy to violate
RICO arise from defendants' conduct in the real estate transactions and methadone clinics.

21      [4] During oral argument, the Tribe repeatedly emphasized its theme of the case of one

22  overarching scheme to use tribal members' leadership positions and non tribal members to
deprive the Tribe of money and opportunity that should have gone to the Tribe.  The problem

23  with this theory of the case is that the RICO and conspiracy to violate RICO causes of action are
split into essentially two schemes in the TAC: 1) the scheme to deprive the Tribe of the

24  opportunity to operate the smoke shop (claims 1 and 2) (Dkt. # 190 (TAC) ¶¶4.1-5.8); and (2)
the scheme to deprive the Tribe of money, property, and intangible right to honest services with

25  respect to the real estate transactions and methadone clinics (claims 3 and 4) (Dkt. # 190 ¶¶ 6.1-
7.9.  The Tribe cannot credibly argue that the predicate acts of cigarette trafficking and money

26  laundering, that were only pled with respect to claims 1 and 2, were predicate acts for claims 3
and 4.  Indeed, the only predicate acts pled in support of claims 3 and 4 are mail and wire fraud.

27  *Id.* (¶¶ 6.6-6.8, 7.6-7.8).

1    Having considered the memoranda, declarations, exhibits, spreadsheets, oral

2    argument and the record herein, the court GRANTS in part and DENIES in part

3    Defendants' motions for summary judgment.

4                                   **II. BACKGROUND**

5    Defendants became acquainted with Edward Goodridge Sr. and Edward

6    Goodridge Jr. in 2001, when Goodridge Sr. was the Chairman of the Tribe's Board of

7    Directors and Goodridge Jr. was the Tribe's Executive Director.  Nelson and Chapman

8    were involved in various transactions, either as investors, agents, or otherwise, involving

9    real estate, methadone clinics, and the smoke shop.

10    With respect to the real estate transactions, in 2001, the Tribe executed a retainer

11    agreement with Towne or Country Real Estate that identified Nelson and Chapman as the

12    Tribe's real estate agents.  Dkt. # 344-4 at 4-5 (Ex. 25 to Baker Decl.).  In 2002, the Tribe

13    and Tribal Consulting LLC, of which Nelson and Chapman were managing members,

14    entered into an agreement to consult with respect to zoning ordinances, acquiring

15    investors, and various ventures related to land acquisitions.  *Id.* at 7-25 (Ex. 26 to Baker

16    Decl.).  As the Tribe's real estate agents, Nelson and Chapman worked with the Tribe,

17    typically through Goodridge Jr., to find and purchase various properties.  The sales prices

18    of the various properties were allegedly in an amount greater than the assessed value of

19    the property.  Nelson and Chapman also allegedly charged excessive commissions with

20    respect to the MacWhyte and Morehouse properties, and allegedly failed to disclose their

21    own interests with respect to the Nelson, Schmidt, RAD and Pilchuck properties.  Dkt. ##

22    344-1 at 28, 30 (Ex. 2 to Baker Decl., Dreger Depo. 220:8-221:9, 288:7-13); 344-4 at 70

23    (Ex. 39 to Baker Decl.); 344-4 at 75 (Ex. 40 to Baker Decl.); 344-5 at 46, 48 (Exs. 44 &

24    45 to Baker Decl.).

25    With respect to the methadone clinic, in February 2003, the Tribe and IC Holdings

26    LLC (signed by Chapman and Nelson) entered into an agreement whereby IC Holdings

27    loaned the Tribe the funds needed to start up the Island Crossing Counseling Services

1   Clinic ("ICCS" or the "Methadone Clinic") in exchange for a share of the revenue of the

2   Methadone Clinic.  Dkt. # 340-2 at 2-25 (Ex. I to Baker declaration in support of

3   opposition to Ashley's Motion for Summary Judgment ("Baker ISO Ashley MSJ")).  In

4   December 2004, the Tribe and Native Health Systems, LLC ("NHS") entered an

5   agreement allowing NHS to use Thomas Ashley to open methadone clinics for other

6   tribes in exchange for a share of the revenue.  Dkt. # 340-2 at 38-42 (Ex. O to Baker ISO

7   Ashley MSJ).

8        With respect to the smoke shop, in March 2003, Goodridge Sr. and Nelson

9   executed a loan agreement, whereby Nelson agreed to loan $100,000 to Goodridge Sr. to

10   allow him to operate a smoke shop on Tribal land in exchange for a share of the profits.

11   Dkt. # 344-2 at 52-70 (Ex. 13 to Baker Decl.).[5]  Goodridge Jr. and Chapman executed a

12   similar loan, whereby Chapman loaned Goodridge Jr. $50,000 for a share of the revenue

13   in the smoke shop. Dkt. # 344-3 at 2-13 (Ex. 14 to Baker Decl.).  Goodridge Jr. formed

14   Native American Ventures LLC ("NAV") to operate the smoke shop as a private business

15   (*see* Dkt. # 344-3 at 63 (Ex. 20 to Baker Decl.)), and Goodridge Sr., Goodridge Jr., and

16   Sara Schroedl operated the smoke shop. The smoke shop sold contraband cigarettes, and

17   the Tribe did not enter into a compact with Washington State to legally operate the smoke

18   shop until 2009.

19        In May 2007, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")

20   raided the smoke shop.  Dkt. # 342 (Yanity Decl.) ¶ 2.  As a result, the Tribe began an

21   investigation of the business transactions involving Goodridge Sr., Goodridge Jr.,

22   Schroedl, Nelson and Chapman.  *Id.* ¶ 3.  In November 2008, Goodridge Sr. and

23   Goodridge Jr. were placed on administrative leave from their leadership positions with

24

25   ───────────────

26   [5] On January 22, 2007, Goodridge Sr. and Nelson entered into an addendum that "they
    will share 50/50 in net profits of all companies that were originated from the roots of the original
    investment covered" by the original loan. Dkt. # 344-2 at 68 (Ex. 13 to Baker Decl.).  Included

27   are "all profits after return of investment capital in" NHS, smoke shops, and other businesses.

1   the Tribe.  *Id.* ¶ 6. Also in November 2008, Goodridge Sr., Goodridge Jr., and Schroedl

2   pled guilty to violating the Cigarette Trafficking Act ("CCTA," 18 U.S.C. §§2341-2346)

3   and to laundering of money (18 U.S.C. § 1957) they obtained from the trafficking

4   scheme.  Dkt. # 344-3 at 23-50 (Exs. 17 & 18 to Baker Decl.).  In early 2009, the Tribe

5   terminated the business relationships between the Tribe and Nelson and Chapman.  Dkt.

6   # 342 (Yanity Decl.) ¶ 9.

7                                    **III. ANALYSIS**

8   **A.  Legal Standard**

9           Summary judgment is appropriate if there is no genuine dispute as to any material

10  fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

11  56(a).  The moving party bears the initial burden of demonstrating the absence of a

12  genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

13  Where the moving party will have the burden of proof at trial, it must affirmatively

14  demonstrate that no reasonable trier of fact could find other than for the moving party.

15  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  On an issue where the

16  nonmoving party will bear the burden of proof at trial, the moving party can prevail

17  merely by pointing out to the district court that there is an absence of evidence to support

18  the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets

19  the initial burden, the opposing party must set forth specific facts showing that there is a

20  genuine issue of fact for trial in order to defeat the motion.  *Anderson v. Liberty Lobby,*

21  *Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most

22  favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

23  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

24          However, the court need not, and will not, "scour the record in search of a genuine

25  issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also,*

26  *White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (the court need not

27  "speculate on which portion of the record the nonmoving party relies, nor is it obliged to

1    wade through and search the entire record for some specific facts that might support the

2    nonmoving party's claim").[3]

3    **B. Evidentiary Analysis**

4              In resolving a motion for summary judgment, the court may only consider

5    admissible evidence.  *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).  At the

6    summary judgment stage, a court focuses on the admissibility of the evidence's content,

7    not on the admissibility of the evidence's form.  *Fraser v. Goodale*, 342 F.3d 1032, 1036

8    (9th Cir. 2003).

9              Chapman moves to strike the Tribe's proffered proof of damages regarding the

10   real property transactions.  Dkt. # 350-1 at 3.  Chapman argues that excerpts from the

11   expert witness reports are inadmissible and that an expert report cannot be used to prove

12   the existence of facts set forth therein.  *Id.*  In response to the motion to strike, the Tribe,

13   without seeking leave, filed a supplemental brief and declarations from its expert

14   witnesses.  The court will accept the belatedly filed expert declarations that authenticate

15   the expert reports.  However, an expert report cannot be used to prove the existence of the

16   facts set forth therein. *In re Citric Acid Litigation*, 191 F.3d 1090, 1102 (9th Cir. 1999).

17   Accordingly, the court has considered the expert reports consistent with applicable case

18   law and Federal Rule of Evidence 702.

19

20

21              [3] This court has spent an inordinate amount of time hunting through the voluminous

22   record for the evidentiary basis of the Tribe's claims and Defendants' statute of limitations
     defense.  When the court could not find the evidentiary basis, it required the parties to provide

23   the court with a spreadsheet identifying the evidentiary basis.  Dkt. # 381.  Following review of
     the spreadsheets, the court identified 26 questions for the parties to address during oral argument,

24   which included requiring the parties to cite to the record and provide relevant legal authority,
     even if not previously provided.  Dkt. # 390.  The court held oral argument on March 28, 2013

25   for approximately 4 hours.  Even after the court reviewed the evidence identified in the

26   spreadsheets and identified by the Tribe during oral argument, the Tribe has not provided the
     court with sufficient information to withstand summary judgment on its RICO claims.

27

1    Nelson also asks the court to strike the Yanity declaration as a sham.  Dkt. # 351

2    (Reply) at 5.  Nelson argues that paragraph 11 contradicts Yanity's deposition testimony.

3    To the extent that paragraph 11 contradicts his deposition testimony, the court has

4    disregarded paragraph 11.  *Compare* Dkt. # 342 (Yanity Decl.) ¶ 11 *with* Dkt. # 352

5    (Supp. Shafer Decl.), Ex. 2 (Yanity Depo. at 187:9-15, 218:7-219:11).

6        After oral argument, Nelson filed a motion to exclude two documents referenced

7    by the Tribe during oral argument (Dkt. # 396) and a motion to strike the Tribe's

8    opposition to its motion to strike the Yanity declaration (Dkt. # 401).  With respect to the

9    latter, the notice of opposition to the motion to strike, filed approximately seven months

10   after the request to strike, is not timely, and the court has not considered it.  With respect

11   to the former, Nelson argues that the Tribe used two documents that were not part of

12   plaintiff's opposition papers. However, Nelson has also used documents that were not

13   part of its papers in response to the court's questions.  Dkt. # 383-4 at 1 (citing Dkt. ##

14   340-1, 340-2).  The documents cited by the Tribe (340-2 at 62 and 64) and the documents

15   cited by Nelson in his spreadsheet are all part of the record and were provided to the

16   court in response to the court's questions.  Accordingly, Nelson's motion to exclude is

17   DENIED.

18       The court notes that Nelson has provided the court with an exhibit that

19   summarizes the 23 closed property transactions, which include closing dates for various

20   properties.  Dkt # 297 (Nelson Decl.) ¶ 6, Ex. 24.  The Tribe has not objected to this

21   document on any grounds.  Accordingly, the court has considered it.

22   **C. RICO and Conspiracy to Violate RICO** (second, third and fourth causes of action)

23       RICO provides a private cause of action for any person injured in his business or

24   property by reason of a violation of RICO's criminal provisions, 18 U.S.C. § 1962.  18

25   U.S.C. § 1964.  Section 1962(c), which the Tribe invokes here, makes it "unlawful for

26   any person employed by or associated with any enterprise engaged in, or the activities of

27   which affect interstate . . . commerce, to conduct or participate, directly or indirectly, in

ORDER - 7

1  the conduct of such enterprise's affairs through a pattern of racketeering activity."  18

2  U.S.C. § 1962.  "[R]acketeering activity" is defined to include a long list of state and

3  federal crimes, including violation of the CCTA, money laundering, mail fraud (18

4  U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).  Additionally, it is "unlawful for any

5  person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this

6  section."  18 U.S.C. § 1962(d).  For purposes of a RICO conspiracy, a conspiracy may

7  exist even if a conspirator does not agree to commit or facilitate each and every part of

8  the substantive offense.  *Salinas v. United States*, 522 U.S. 52, 63 (1997).  "One can be a

9  conspirator by agreeing to facilitate only some of the acts leading to the substantive

10  offense."  *Id.* at 65.  "The interplay between subsections (c) and (d) [of section 1962]

11  does not permit [the court] to excuse from the reach of the conspiracy provision an actor

12  who does not himself commit or agree to commit the two or more predicate acts requisite

13  to the underlying offense."  *Id.*

14       To have standing under section 1964(c), a civil RICO plaintiff must prove that (1)

15  defendant participated in an enterprise that (2) engaged in a pattern of racketeering

16  activity that (3) caused plaintiff an (4) injury to its business or property.  *See Canyon*

17  *County v. Syngenta Seeds, Inc.* 519 F.3d 969, 972 (9th Cir. 2008).  RICO confers

18  standing only on a person injured in his business or property by reason of a violation of

19  the statute.  18 U.S.C. § 1964(c).  With respect to causation, the plaintiff must show that a

20  RICO predicate offense not only was a "but for" cause of his injury, but was the

21  proximate cause as well.  *Hemi Group, LLC v. City of N.Y.*, 130 S.Ct. 983, 989 (2010).

22  Proximate cause requires "'some direct relation between the injury asserted and the

23  injurious conduct alleged.'"  *Id.*  A link that is too remote, purely contingent, or indirect

24  is insufficient.  *Id.*  In the RICO context, "the focus is on the directness of the relationship

25  between the conduct and the harm."  *Id.* at 991. "When a court evaluates a RICO claim

26  for proximate causation, the central question it must ask is whether the alleged violation

27

1    led directly to plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461

2    (2006).

3        Nelson argues that the Tribe lacks standing because, although a "person" for

4    purposes of RICO, it is acting in its sovereign capacity.  The court has already held that

5    "the Tribe does not seek to vindicate its sovereign rights, but rather seeks to assert a right

6    available that RICO makes available to every 'person,' the right to recover damages

7    caused by an injury to business or property."  Dkt. # 65 at 12; *see also* 18 U.S.C. §

8    1961(3) ("Person" includes "any individual or entity capable of holding a legal or

9    beneficial interest in property.").  *Canyon County v. Syngenta Seeds, Inc.*, on which

10   Nelson relies, is therefore distinguishable.  519 F.3d 969 (9th Cir. 2008) (a sovereign

11   acting in a *parens patriae* capacity lacks RICO standing).

12       Chapman argues that the Tribe lacks standing[6] because the Tribe cannot prove

13   causation with respect to the real estate transactions, the methadone clinics, or the smoke

14   shop.  Dkt. # 283 at 5-10.  Nelson argues that the Tribe has failed to demonstrate

15   proximate causation with respect to the smoke shop.  Dkt. # 296 at 3-4.

16           a.  *Smoke Shop*

17       With respect to the smoke shop, the Tribe has identified a loss of approximately

18   $15 million from the "opportunity to legally operate the smoke shop from 2003 to 2009."

19

20   _____

21       [6] The Tribe conflates the relevant standard for a motion to dismiss and motion for
     summary judgment.  *See* Dkt. # 341 at 9 n.35.  While the court found that the Tribe's allegations
22   in its TAC were sufficient to withstand dismissal on a Rule 12(b)(6) motion, on summary
     judgment, the Tribe must present evidence that raises a genuine dispute of material fact as to
23   whether the alleged predicate acts proximately caused an actionable injury.  *See Bhatia v. Wig*,
     479 Fed. Appx. 768, 768-69 (9th Cir. 2012) (unpub.).  During oral argument, the Tribe argued
24   that the court previously ruled that the court need not consider the superfluous mail and wire
     fraud predicate acts.  The court did so hold in ruling on Schroedl's motion to dismiss, among
25   others, the first and second causes of action.  Dkt. # 65 at 11.  However, that ruling did not
     address the third and fourth causes of action regarding the real estate transactions and methadone
26   clinics because Schroedl is not a named defendant in those claims.  *See* Dkt. # 65 at 3:14-19.
     Those claims only allege the predicate acts of mail and wire fraud.
27

ORDER - 9

1  Dkt. # 341 at 8.  However, in order to legally operate the smoke shop, the Tribe would

2  have had to enter a compact with the State of Washington.  While it did so in 2009 after

3  the raid, the court has already held that the assumption that the Tribe would have entered

4  a compact with the State ignored numerous uncertainties, including whether the Tribal

5  Board would have voted to enter a compact, even without the self-interest of Goodridge

6  Sr., Goodridge Jr., and Schroedl, who were on the Board.  Dkt. # 65 at 14.

7          During oral argument, the Tribe identified the following as evidence that it could

8  have legally and profitably operated the smoke shop: (1) Yanity's declaration at page 1,

9  (2) the victim impact statement that identifies a letter from former Governor Gary Locke,

10  (3) Goodridge Sr.'s plea agreement, and (4) an expert report by Knowles.  With respect to

11  the Yanity declaration, he states that the Tribe discovered after the raid that the "benefits

12  of compacting with the state of Washington had not been explained to the Board of

13  Directors previously."  Dkt. # 342 (Yanity Decl.) ¶ 2.  "As a result, the Tribe began

14  negotiating a compact with the state of Washington."  *Id.*  With respect to the victim

15  impact statement and the plea agreement, the Tribe apparently offers these documents for

16  the truth of the matters asserted therein.  The fact that Governor Locke sent a letter to the

17  Tribe, and the fact that he offered to enter into a compact is hearsay.[7]  Fed. R. Evid. 801.

18  Surprisingly, the Tribe has not provided the court with a copy of this letter.[8]  Similarly,

19  statements agreed to by Goodridge Sr. in his plea agreement regarding the $25 million in

20  tax revenue that Washington was deprived appears to be offered for the truth of that

21  statement.[9]  Even if the court considered these hearsay statements, there is no evidence

22  that the Tribal Board would have voted to enter into a compact even had Goodridge Sr.,

23

24          [7] When asked for the basis for the admissibility of this document during oral argument,
the Tribe responded that it could be authenticated at trial. However, authentication does not solve

25  the hearsay problem.

26          [8] It is unclear to the court how the Tribe expects the court to rely upon the accuracy of a
document without the benefit of reviewing the letter.

27          [9] Goodridge Sr. is no longer a party.

1   Goodridge Jr. and Schroedl not been motivated by a desire to further the trafficking

2   scheme. Nor is there evidence that the other Tribal board members would have voted to

3   enter the compact.

4       Given the uncertainty and the lack of evidence, the court concludes that the

5   predicate acts of cigarette trafficking, money laundering, mail and wire fraud were not

6   the proximate cause of the Tribe's lost opportunity to legally and profitably operate the

7   smoke shop.

        *b.   Real Estate Transactions and Methadone Clinic*

8       With respect to the real estate transactions, the Tribe identifies three types of

9   injuries:  (1) damages resulting from the pending property transactions, (2) damages

10  resulting from the closed property transaction, and (3) damages resulting from excessive

11  commissions.  Dkt. # 341 at 15-16.  Chapman argues that independent, intervening

12  factors present in the real estate market defeat the Tribe's RICO claims related to the real

13  estate purchases.  Dkt. # 283 at 5.

14      With respect to the closed property transactions, the court finds that a number of

15  steps separate the alleged predicate acts from the asserted injury of paying "inflated"

16  prices.  *See Hemi*, 130 S.Ct. at 992 ("multiple steps . . . separate the alleged fraud from

17  the asserted injury").  For instance, several individual sellers dictated the sales price and

18  were unwilling to sell for less.  *See* Dkt. ##285-89, 291-92, 294-95.[10]  Additionally, the

19  Tribe found certain property to be more valuable than others because of the ability to put

20  the property into trust or because of cultural significance.  Dkt. # 344-1 at 21 (Ex. 2 to

21  Baker Decl., Dreger Depo. at 104:10-22, 105:8-18); Dkt. # 321 (Shafer Decl.), Ex. 1

22  (Yanity Depo.) at 153:22-154:22.

23

24

25      [10] With respect to the declaration of Mr. Hayes, the property description and details do
    not match the allegations in the amended complaint as one of the 23 properties sold at allegedly

26  inflated prices.  Dkt. # 290.  With respect to the declaration of Ms. Morehouse, the property
    described is included in the TAC with respect to overbilled commissions, not one of the 23

27  properties that were sold at allegedly inflated prices.  Dkt. # 293.

1    During oral argument, the Tribe identified the following evidence to support its

2    argument that the Tribe could have actually purchased the various real estate properties at

3    a price less than the sales price or at fair market value, as assumed by the experts: (1) the

4    Yanity declaration at page 2, and (2) Jody Soholt's testimony as the Tribe's 30(b)(6)

5    witness at Dkt. # 321-3.  The only statement in Yanity's declaration relevant to the closed

6    property transactions is that the "Tribe's investigation concluded that the past

7    transactions and many pending transactions were overpriced and/or did not sufficiently

8    benefit the Tribe."  Dkt. # 342 (Yanity Decl.) ¶ 8.  The remaining statements in

9    paragraphs 9 and 10 only deal with the pending property transactions.  The fact that the

10   Tribe re-negotiated favorable terms on one pending property transaction (Dabestani) that

11   later closed is not evidence that the Tribe could have actually purchased any of the 23

12   closed property transactions at a lower price than the sales price.  With respect to Ms.

13   Soholt's testimony, she was asked whether, with 20/20 hindsight, there were any

14   properties that she wished the Tribe had not purchased.  She responded that she wished

15   the Purdy estate had not been purchased because it was of no use.  Dkt. # 321-3 at 6-7

16   (Ex. 3 to Shafer Decl., Soholt 30(b)(6) Depo. 77:8-78:11).  Nothing in Ms. Soholt's

17   testimony at Dkt. # 321-3 even suggests that the Tribe could have purchased any of the

18   closed property transactions for less than the sales price.  The Tribe has not presented any

19   evidence that it actually could have purchased the various properties at fair market value,

20   or at any price less than the sales price, especially where the sellers ultimately decided

21   whether and at what price they would sell.  *See* Dkt. ##285-89, 291-92, 294-95.

22   Accordingly, the court finds that the Tribe has failed to create a genuine issue of

23   material fact with respect to whether the alleged predicate acts of mail and wire fraud

24   were the proximate cause of the damages incurred from the overpriced closed property

25   transactions.

26   With respect to the pending property transaction damages, the Tribe has presented

27   evidence that to avoid further injury, the Tribe "walked away" from various properties

ORDER - 12

1    that had been negotiated by Defendants, and lost its earnest money deposits.  Dkt. # 342

2    (Yanity Decl.) ¶ 9.  However, the Tribe has failed to present evidence that creates a

3    genuine issue of material fact that the loss of the earnest money was a direct result of the

4    predicate acts, as opposed to market conditions, a seller's inflated sales price, or the

5    Tribe's own subjective value of the property.

6         With respect to the excessive commissions, the Tribe has presented evidence that

7    the Tribe paid commissions in excess of industry standards or the stated contract price

8    with respect to the MacWhyte and Morehouse properties.  Dkt. # 344-5 at 48 (Ex. 45 to

9    Baker Decl.).  However, there is no evidence that creates a genuine issue of material fact

10   that the predicate acts of mail and wire fraud proximately caused the injury of excess

11   commission payments.

12        With respect to the methadone clinics, the Tribe claims two types of injuries:

13   ICCS damages and NHS damages.[11]  Chapman argues that the damages related to the

14   financing and operation of the methadone clinics are entirely speculative.  Dkt. # 283 at

15   15.  Specifically, Chapman argues that inquiry into whether more conventional financing

16   was available and what financing the Tribal Board would have selected absent alleged

17   wrongdoing is speculative and uncertain.  The Tribe has presented evidence that

18   individual members of the Tribe would have provided financing for the Methadone

19   Clinic.  Dkt. # 343 (Claxton Decl.) ¶¶ 6-10.  However, the Tribe has not presented any

20   evidence regarding whether the Tribal Board would have selected a member-financed

21

22

23

24        [11] With respect to the ICCS damages, the Tribe argues that its damages are the additional
25   cost of the predatory financing where there was alternate financing available for the Methadone
     Clinic. Dkt. # 341 at 16-17.  With respect to the NHS damages, the Tribe argues that it was
26   deprived of its promised 5% of the income of clinics when Defendants, via NHS, misused the
     Tribe's employees, intellectual property, good will and good name in order to convince other
27   native groups to retain them as consultants in connection with methadone clinics.  *Id.* at 18.

1    option over the financing it received,[12] or evidence that alternate bank-financing was

2    available for the Methadone Clinic.[13]  Additionally, there simply is no evidence that

3    creates a genuine issue of material fact that the predicate acts of mail and wire fraud led

4    directly to the cost of "exorbitant" financing from defendants.  Accordingly, the court

5    finds that these alleged damages are speculative and uncertain.

6         Chapman also argues that there is no way for the court to determine whether the

7    Tribe has lost any "good will and good name" as a result of the Defendants' RICO

8    predicate acts, or if such loss is the result of independent factors like the Tribe's own

9    business practices in the Methadone Clinic.  Dkt. # 283 at 16.  The court agrees.[14]  The

10   court also believes that it will be difficult to ascertain whether the Tribe's claimed loss of

11   5 percent of the income of the other clinics, or a portion of that loss, is attributable to

12   Defendants' alleged misuse of the Tribe's good will and intellectual property, or to some

13   other source, such as the operation and management of those methadone clinics by

14   different tribes.  Additionally, the Tribe has not presented any evidence that the loss of 5

15   percent of the income is directly attributable to Defendants' predicate acts.

16        Accordingly, the court finds that the Tribe has not presented evidence that raises a

17   genuine dispute of material fact as to whether the alleged predicate acts proximately

18   caused its damages with respect to the property transactions and the methadone clinics.

19        During oral argument, the Tribe reiterated its position that the conspiracy involved

20   the same group of people who tried to get their hands into any business venture, and that

21

22        [12] The court notes that there is no evidence that Tribal members could have or would

23   have provided 100 percent of the financing, which would have eliminated the need for bank
     financing.

24        [13] Evidence that the bank would have financed other projects is not evidence that
     alternate financing was available for the Methadone Clinic.

25        [14] During oral argument, the Tribe conceded that it had not presented any bribery or

26   kickback evidence, which is required for honest services fraud under section 1346.  *See Skilling*

27   *v. United States*, 130 S.Ct. 2896, 2933 (2010) (holding that honest services fraud does not
     encompass conduct more wide-ranging than bribes and kickbacks).

ORDER - 14

1    the enterprise as a whole was implanted through predicate acts.  The Tribe also argued

2    that an actor in a conspiracy does not shield himself from liability by keeping himself

3    clean and removed from transactions.  The court agrees with the Tribe that Section

4    1962(d) liability does not require that the defendant commit or agree to commit two or

5    more predicate acts.  *Salinas v. United States*, 522 U.S. 52, 65 (1997).  It is sufficient that

6    a conspirator "adopt the goal of furthering or facilitating the criminal endeavor" that, if

7    completed, would satisfy all elements of the substantive offense.  *Id.*  Thus, under

8    *Salinas*, Nelson and Chapman need not have committed the predicate acts themselves, so

9    long as they knew about and agreed to facilitate the scheme.  However, the conspiratorial

10   acts that cause the injury must still be an act of racketeering as defined by section

11   1961(1).  *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 295 (9th Cir. 1990) (holding "that

12   the district court did not err in dismissing Reddy's § 1962(d) claim on standing grounds

13   because the act of terminating Reddy's employment is not a predicate act as defined by §

14   1961(1), . . ."), *cert denied*, 112 S. Ct. 332 (1991); *see also Beck v. Prupis*, 529 U.S. 494,

15   505 (2000) (concluding that an "injury caused by an overt act that is not an act of

16   racketeering or otherwise wrongful under RICO . . . is not sufficient to give rise to a

17   cause of action under § 1964(c) for a violation of §1962(d).").  Since the Tribe does not

18   have standing under the section 1962(c) claim, the Tribe has not created a genuine issue

19   of material fact that its injury was caused by a conspiracy to commit a predicate RICO

20   violation.  *Reddy*, 912 F.2d 295.

21   **D. Breach of Fiduciary and Statutory Duties** (seventh cause of action)

22        To support a claim for damages for breach of fiduciary duty under Washington

23   law, the Tribe must show (1) the existence of a duty owed to it, (2) a breach of that duty,

24   (3) a resulting injury, and (4) that the claimed breach was the proximate cause of the

25   injury.  Dkt. # 283 at 17, # 341 at 20; *Miller v. U.S. Bank of Wash., N.A.*, 72 Wash. App.

26   416, 426 (1994).  A proximate cause is one that in natural and continuous sequence,

27

1    unbroken by an independent cause, produces the injury complained of and without which

2    the ultimate injury would not have occurred.  *Attwood v. Albertson's Food Ctrs., Inc.*, 92

3    Wash. App. 326, 330, 966 P.2d 351 (1998).  A plaintiff need not establish causation by

4    direct and positive evidence, but only by a chain of circumstances from which the

5    ultimate fact required is reasonably and naturally inferable.  *Id.* at 331.  However,

6    evidence establishing proximate cause must rise above speculation, conjecture, or mere

7    possibility.  *Id.*  Generally, the issue of proximate cause is a question for the jury.  *Id.* at

8    330.  However, when the facts are undisputed and the inferences therefrom are plain and

9    incapable of reasonable doubt or difference of opinion, it may be a question of law for the

10   court.  *Id.*

11        Chapman challenges the proximate cause element.  The Tribe identified the

12   following injuries: (1) the difference in costs from the sales price of the completed

13   property transactions and the "best possible purchase price" (Dkt. # 341 at 21), (2) lost

14   earnest money from transactions that were not in the Tribe's best interest (Dkt. # 382-1

15   (Ex. 1) at 3), (3) the cost of certain properties or lost earnest money that the Tribe would

16   not have otherwise purchased or contracted for had they known of Defendants' conflicts

17   of interest (Dkt. # 341 at 23), and (4) the excess commissions (Dkt. # 382-1 (Ex. 1) at 4).

18        The court finds that the Tribe has failed to demonstrate a genuine issue of material

19   fact of proximate cause with respect to the first and second injury.  The failure to obtain

20   the "best possible purchase price" is entirely speculative and uncertain.  The undisputed

21   evidence demonstrates several independent causes that caused the injury of the difference

22   in cost between the best possible price and the sales price, including market conditions,

23   the sellers' list price, or the Tribe's own value in certain properties for location or cultural

24   significance.  *See* Dkt. ## 285-89, 291-92, 294-95; Dkt. # 344-1 at 21 (Ex. 2 to Baker

25   Decl., Dreger Depo. at 104:10-22, 105:8-18); Dkt. # 321 (Shafer Decl.), Ex. 1 (Yanity

26   Depo.) at 153:22-154:22.  The Tribe has not presented evidence from which the court

27   could naturally and reasonably infer that a breach of fiduciary duty proximately caused

1    the injury.[15]  With respect to the second injury, the only evidence presented by the Tribe

2    to support proximate causation is the second page of Yanity's declaration. Dkt. # 382-1

3    (Ex. 1) at 3 (identifying p.2 of Yanity Decl.).  The fact that the Tribe concluded that

4    various transactions were not in the Tribe's best interest and the Tribe decided to "walk

5    away" (*see* Dkt. # 342 (Yanity Decl.) ¶¶ 7-9) does not create a genuine issue of material

6    fact that a breach of fiduciary duties proximately caused the lost earnest money as

7    opposed to market conditions, a seller's inflated sales price, or the Tribe's own valuation

8    of various properties based on location and cultural significance.

9            With respect to the third injury, the Tribe has presented evidence that it would not

10   have assumed payments on a specific property had Nelson disclosed the fact that his son

11   lived there.  Dkt. # 344-1 at 30 (Ex. 2 to Baker Decl., Dreger Depo. at 288:7-22).  The

12   Tribe has also presented evidence that Nelson failed to disclose to the Tribe his personal

13   involvement in various transactions or groups that sought to sell land to the Tribe.[16]  *Id.* at

14   28 (220:8-221:9) (identifying RAD and Pilchuck Group as properties purchased by

15   investment group of which Nelson was a party, and the residence in which his son was

16   living).  The Tribe also identifies lost earnest money deposit on the Schmidt and Nelson

17   property.[17]  Although the relevant contracts provide evidence of Nelson's familiar

18   relationship to Schmidt (Dkt. # 344-4 at 63 (Ex. 38 to Baker Decl.)), and lists Nelson as

19   the seller (Dkt. # 344-4 at 70 (Ex. 39 to Baker Decl.), the Tribe has presented evidence,

20   although disputed, that the Board frequently approved transactions without having the

21   sales contract and other relevant documents before it (Dkt. # 344-1 at 22, 29-30, 42 (Ex. 2

22

23   ───────────────────

24       [15] The Tribe has not directed the court to any legal authority that would require a real
     estate agent to use a straw buyer as part of its fiduciary duties.

25       [16] Defendants have presented evidence that they disclosed their various conflicts, which
     creates an issue of fact for the jury to resolve.  Dkt. # 344-1 at 58 (Ex. 5 to Baker Decl., Nelson

26   Depo. 79:1-81:13); # 344-4 at 63, 81 (Exs. 38, 40 to Baker Decl.).
         [17] It is unclear to the court whether the property in which Nelson's son lived is the same

27   as the Nelson property or the Schmidt property.

1  (Dreger Depo. at 112:12-113:5, 285:13-21) and Ex. 3 (Goodridge Jr. Depo. at 150:22-

2  151:8) to Baker Decl.)).  With respect to the fourth injury, the Tribe has presented

3  evidence that it paid commissions in excess of the agreement and/or industry standard

4  with respect to the MacWhyte and Morehouse properties.  Dkt. # 344-5 at 46, 48 (Exs. 44

5  & 45 to Baker Decl.).

6      The court finds that the inferences drawn from these facts make summary

7  judgment inappropriate with respect to the damages proximately caused by defendants'

8  failure to disclose material facts or conflicts of interest and charging excessive

9  commissions.

10     However, Nelson argues that the statute of limitations bars this claim in its

11 entirety.[18]  The statute of limitations for breach of fiduciary duty is three years, and it

12 accrues when plaintiff knows or has reason to know the essential elements of the claim.

13 RCW 4.16.080(2); *see Hudson v. Condon*, 101 Wash. App. 866, 873-75, 6 P.3d 615

14 (2000) (applying discovery rule to breach of fiduciary duty claim).  Here, if the statute of

15 limitations accrued prior to February 25, 2007, the claim will be time-barred.

16     With respect to the property in which Nelson's son was living and the Pilchuck,

17 RAD, Nelson and Schmidt properties, Defendants have failed to present any evidence

18 that the claim accrued before February 25, 2007.  *See* Dkt. # 383-3, Ex. 2 (identifying

19 dates of purchase options as April 1, 2008).[19]

20     In July and October 2006, the Tribe and Nelson executed an agreement indicating

21 the amount of commissions that would be paid upon closing of the Morehouse and

22

23

_____

24     [18] The court has already disposed of the claim based on the first two injuries of best
possible price and lost earnest money from transactions not in the Tribe's interest.  Accordingly,

25 the court will only address the statute of limitations with respect to the breach of fiduciary claim
based on the latter two injuries.

26     [19] The court notes that Defendants have not directed the court to any evidence regarding
when Defendants provided the purchase options to the Tribe.  The court also notes that the RAD

27 purchase agreement did not disclose the conflicts identified by the Tribe.

ORDER - 18

1   MacWhyte properties.  Dkt. # 344-5 at 46, 48 (Exs. 44, 45 to Baker Decl.).  The

2   MacWhyte property closed on August 9, 2006.  Dkt. # 297-1 (Ex. 24 to Nelson Decl.).  It

3   is unclear to the court when the Morehouse property closed or when these commissions

4   were paid by the Tribe.  The court finds that the Tribe should have known about the

5   excessive commissions charged at a minimum after the closing of these properties when

6   the commission was paid.  On the record before it, only the excessive commission with

7   respect to the MacWhyte property is time-barred.

8       Accordingly, the Tribe's breach of fiduciary duty claim may go forward with

9   respect to the failure to disclose material facts and/or involvement with respect to the

10  Nelson property in which his son lived, the RAD, Pilchuck, Schmidt and Nelson

11  transactions, and the excessive commission paid on the Morehouse property.

12  **E. Fraud and Negligent Misrepresentation** (ninth cause of action)

13      To recover for fraud, the Tribe must present clear, cogent and convincing evidence

14  of a (1) representation of existing fact (2) that is false and (3) material (4) that defendant

15  knew to be false or was ignorant of its truth, (5) defendant intended to induce reliance, (6)

16  plaintiff did not know the fact was false, (7) plaintiff relied on the truth of the fact and (8)

17  had a right to rely on it, and (9) that results in damages.  *See Baertschi v. Jordan*, 68

18  Wash. 2d 478, 482, 413 P.2d 657 (1966).  The absence of any of the nine elements is

19  fatal to the Tribe's claim.  *Id.*  To recover for negligent misrepresentation, the Tribe must

20  present clear, cogent and convincing evidence that (1) defendant supplied information for

21  the guidance of others in their business transactions that was false, (2) defendant knew or

22  should have known that the information was supplied to guide the plaintiff in his business

23  transactions, (3) defendant was negligent in obtaining or communicating the false

24  information, (4) plaintiff relied on the false information, (5) plaintiff's reliance was

25  reasonable, and (6) the false information proximately caused the plaintiff damages.  *Ross*

26  *v. Kirner*, 162 Wash. 2d 493, 499, 172 P.3d 701 (2007).

27

1    During oral argument, the Tribe identified four facts that it claims were

2    misrepresented and/or false: (1) the Methadone Clinic was a high risk transaction; (2)

3    alternate financing was not available for the Methadone Clinic; (3) the true fair market

4    value of real estate transactions; (4) the financial interests of Defendants and/or lack of

5    identification of the true owners of some properties.

6         With respect to the first, the Tribe argued during oral argument that Nelson

7    conceded that there was no real risk involved in providing financing for the Methadone

8    Clinic because they had guaranteed mechanisms that he and other investors would be

9    repaid, citing Dkt. # 344-1 at 65.  The court has reviewed Nelson's deposition transcript.

10   The "guaranteed mechanism" referenced by counsel was a contingency upon

11   nonapproval if the Tribe did not obtain all governmental approvals, which would trigger

12   the Tribe's obligation to reimburse IC Holdings the advances from the investors.  Dkt. #

13   344-1 at 64 (Ex. 5 to Baker Decl., Nelson Depo. 180:10-182:11).  Even if the court could

14   reasonably infer that this statement is false, the Tribe has not directed the court to any

15   evidence that Nelson or Chapman made the representation of the high risk transaction to

16   the Tribe.

17        With respect to the second, the Tribe has presented evidence that individual tribal

18   members would have provided financing for the Methadone Clinic.  Dkt. # 343 (Claxton

19   Decl.) ¶¶ 6-10.  However, the Tribe has not directed the court to any evidence that Nelson

20   or Chapman made the representation of the lack of alternate financing to the Tribe.

21        With respect to the third, the Tribe argued during oral argument that as real estate

22   agents, defendants had an independent obligation to get the best possible price for the

23   Tribe.

24

25

26

27

1   The economic loss rule[20] "applies to hold parties to their contract remedies when a
2   loss potentially implicates both tort and contract relief." *Alejandre v. Bull*, 159 Wash. 2d
3   674, 681, 153 P.3d 864 (2007).  The rule prohibits plaintiffs from recovering in tort
4   economic losses to which their entitlement flows only from contract because tort law is
5   not intended to compensate parties for losses suffered as a result of a breach of duties
6   assumed only by agreement. *Id.* at 682.  However, an injury is remediable in tort if it
7   traces back to the breach of a tort duty arising independently of the terms of the contract.
8   *Eastwood*, 170 Wash. 2d at 389.  "When no independent tort duty exists, tort does not
9   provide a remedy. *Id.*

10   Here, while Nelson and Chapman had independent duties because they were real
11   estate agents (RCW 18.86), one of those independent duties was not to get the best
12   possible price.  Rather, that "duty" is found in the consulting agreement.  Dkt. # 344-4 at
13   9 (Ex. 26 to Baker Decl.) ("Negotiate with landowners on behalf of the Tribe to secure
14   the lowest possible land prices and to secure land contract terms that are acceptable to the
15   Tribe.").  Accordingly, the independent duty rule bars this claim to the extent it relies on
16   Defendants' contract obligation to get the best possible price.

17   With respect to the fourth, Nelson and Chapman had independent duties to
18   disclose all material facts known by them and not apparent or readily ascertainable to a
19   party, to be loyal to the buyer by taking no action that is adverse or detrimental to the
20   buyer's interest, and, among others, to timely disclose to the buyer any conflicts of
21   interest.  RCW 18.86.030(1)(d), 18.86.050(1)(a), (b); *see Jackowski v. Borchelt*, 174
22   Wash. 2d 720, 735, 278 P.3d 1100 (2012) ("common law tort causes of action remain the
23   vehicle through which a party may recover for a breach of statutory duties set forth in
24   chapter 18.86 RCW.").  The court has already held that a disputed issue of material fact
25

26   [20] The Washington Supreme Court has noted that the term "economic loss rule" has
27   proved to be a misnomer, and has opted for the term independent duty rule. *Eastwood v. Horse Harbor Found., Inc.*, 170 Wash. 2d 380, 387, 241 P.3d 1256 (2010).

exists with respect to whether Nelson and Chapman failed to disclose to the Tribe their financial interests or familial relationships with respect to the property in which Nelson's son resided, and the RAD, Pilchuck, Schmidt and Nelson property transactions. *See* Dkt. # 344-1 at 28, 30 (Ex. 2 to Baker Decl., Dreger Depo. at 220:8-221:9, 288:7-22); # 344-1 at 22, 29-30, 42 (Ex. 2 (Dreger Depo. at 112:12-113:5, 285:13-21) & Ex. 3 (Goodridge Jr. Depo. at 150:22-151:8) to Baker Decl.).

Accordingly, the Tribe may proceed on its fraud and negligent misrepresentation claims with respect to the failure to disclose material facts. *See Van Dinter v. Orr*, 157 Wash. 2d 329, 333, 138 P.3d 608 (2006) ("If a party has a duty to disclose information, the failure to do so can constitute negligent misrepresentation.").

**F.   Civil Conspiracy** (tenth cause of action)

To establish civil conspiracy, the Tribe must prove by clear, cogent and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means, and (2) the conspirators entered into an agreement to accomplish the object of the conspiracy. *Wilson v. State*, 84 Wash. App. 332, 350-51, 929 P.2d 448 (1996).  Mere suspicion or commonality of interests is insufficient to prove conspiracy.  *Id.* at 351.

Chapman argues that this claim must fail because there are no underlying illegal acts that can be proven against him.  Nelson agrees, and also argues that this claim is time-barred.  During oral argument, the Tribe essentially conceded that its civil conspiracy claim was dependent on its conspiracy to violate RICO claims.  The court finds dismissal of the Tribe's civil conspiracy claim proper since the court has dismissed the Tribe's RICO conspiracy claims.

**G.   Unjust Enrichment** (eleventh cause of action)

"Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it."

1    *Young v. Young*, 164 Wash. 2d 477, 484, 191 P.3d 1258 (2008).  Three elements must be

2    met for an unjust enrichment claim:  (1) a benefit conferred upon the defendant by

3    plaintiff, (2) an appreciation or knowledge by the defendant of the benefit, and (3) the

4    acceptance or retention by the defendant of the benefit under such circumstances as to

5    make it inequitable for the defendant to retain the benefit without the payment of its

6    value.  *Id.*

7         Unjust enrichment actions have a three-year statute of limitations.  *Eckert v. Skagit*

8    *Corp.*, 20 Wash. App. 849, 850, 583 P.2d 1239 (1978).  "An action for unjust enrichment

9    lies in a promise implied by law that one will render to the person entitled thereto that

10   which in equity and good conscience belongs to that person."  *Id.* at 851.  Generally, a

11   cause of action accrues and the statute of limitations begins to run when a party has the

12   right to apply to a court for relief.  *Id.*

13        The Tribe argues that the court should apply the discovery rule to its unjust

14   enrichment claim.  The Tribe has not cited, and the court is not aware of, any published

15   Washington legal authority applying the discovery rule to an unjust enrichment claim.

16   However, the Washington Supreme Court abrogated a Division One opinion on which

17   the Tribe relied, *Architechtonics Constr. Mgmt., Inc. v. Khorram*, 111 Wash. App. 725,

18   45 P.3d 1142 (2002),[21] that applied the discovery rule to a claim for breach of

19   construction contract.  *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wash. 2d 566, 578

20   (2006) (en banc).  The Washington Supreme Court reasoned that because "controlling

21   precedent held that a claim arising out of a contract accrued on breach and not on

22   discovery, the Court of Appeals lacked authority to adopt the discovery rule."  *1000*

23   *Virginia*, 158 Wash. 2d at 578.  The Washington Supreme Court then went on to adopt

24   the discovery rule in the limited context of "actions on construction contracts involving

25   allegations of latent construction defects."  *Id.* at 590.

26

27        [21] Dkt. # 341 (Opp'n) at 37, n. 94.

1    During oral argument, the Tribe relied on a 2003 unpublished opinion from

2    Division One that applied the discovery rule to an unjust enrichment claim. *In re Estate*

3    *of Ginsberg*, 119 Wash. App. 1068 (2003) (unpub.).  This case has no precedential value.

4    RCW 2.06.040.  Additionally, it preceded the Washington Supreme Court's holding that

5    claims arising out of a contract accrue on a breach, not on discovery. *1000 Virginia*, 158

6    Wash. 2d at 578. The only evidence cited by the Tribe for the conferred benefits arise out

7    of various contracts.[22] Dkt. # 382-1 at 9.  Accordingly, the court will not apply the

8    discovery rule to the Tribe's unjust enrichment claim.

9         During oral argument, the Tribe also identified four benefits that the Tribe

10   conferred on Defendants: (1) the percentage of smoke shop profits received by

11   Defendants in exchange for the initial loans between the Goodridges and Defendants, (2)

12   the excessive commissions from the agreements on the MacWhyte and Morehouse

13   properties between the Tribe and Defendants, (3) the percentage of revenue Defendants

14   received from financing the Methadone Clinic pursuant to the investment agreement

15   between the Tribe and IC Holdings, and (4) five percent of the profits from other

16   methadone clinics pursuant to the investment agreement between the Tribe and NHS.

17        With respect to the smoke shop profits retained by Defendants, the statute of

18   limitations accrued, at the latest, when Defendants received and retained a percentage of

19

20        [22] The Tribe identified the following evidence: (1) Loan agreements for financing the
     smoke shop in exchange for a share of the net income between Goodridge Sr. and Nelson, and
21   between Goodridge Jr. and Chapman (Dkt. #344-2 at 52-70, #344-3 at 1-17 (Exs 13-14 to Baker
     Decl.)); (2) unexecuted Consulting agreement for investing in the Methadone Clinic between
22   Chapman and Goodridge Jr. (Dkt. #344-3 at 21 (Ex. 16 to Baker Decl.)); (3) Consulting
     agreement between the Tribe and Tribal Consulting LLC, of which Nelson and Chapman are
23   members (Dkt. # 344-4 at 7-25 (Ex. 26 to Baker Decl.)); (4) Agreement between NHS and the
     Tribe for a share of the revenue of methadone clinics opened for other tribes (*see* Dkt. # 340-2 at
24   38-42 (Ex. O to Baker ISO Ashley MSJ)); (5) Agreement to pay excessive commissions on
     Morehouse and MacWhyte properties (Dkt. # 344-5 at 46, # 344-5 at 48 (Exs. 44 & 45)); and (6)
25   Agreement between the Tribe and IC Holdings for reimbursement of investment plus revenue
     share on Methadone Clinic (Dkt. #344-1 at 65 (Ex. 5 to Baker Decl., Nelson Depo. at 182:12-
26   184:18); *see* Dkt. # 340-2 at 2-25 (Ex. I to Baker ISO Ashley MSJ)).

27

1    the revenue from operation of the smoke shop.  The smoke shop opened and operated

2    beginning in 2003.  However, Defendants have not directed the court to evidence

3    regarding when they received and retained the profits.  Dkt. # 383-5 at 1-2.

4           With respect to the excessive commissions from the MacWhyte and Morehouse

5    properties, the statute of limitations accrued upon closing when the commissions were

6    paid. The MacWhyte property closed on August 9, 2006.  Dkt. # 297-1 (Ex. 24 to Nelson

7    Decl.).  Defendants have not directed the court to evidence demonstrating when the

8    Morehouse property closed.

9           With respect to the percentage of revenue from the methadone clinics, the claim

10   accrued, at the latest, when Defendants received and retained payment.  However, the

11   Defendants have not directed the court to evidence demonstrating when they received and

12   retained any of the revenue.  Dkt. # 383-4.

13          Accordingly, on the record before the court, the Tribe's unjust enrichment claim is

14   only barred with respect to the MacWhyte property commissions.

15                                **IV. CONCLUSION**

16          For all the foregoing reasons, the court GRANTS in part and DENIES in part

17   defendants' motions for summary judgment.  The Tribe has not presented any evidence

18   with respect to Mrs. Nelson.  Accordingly, she is DISMISSED from the case with

19   prejudice.  The Clerk is DIRECTED to terminate all pending motions, and to enter an

20   amended case schedule with a trial date of September 23, 2013.  The court notes that the

21   only remaining defendants are Nelson, Chapman, Sara Schroedl, Dean Goodridge, and

22   Towne or Country Smokey Point, Inc.[23]  The claims alleged against Ms. Schroedl are

23   RICO and conspiracy to violate RICO with respect to the smoke shop (claims 1 and 2),

24   civil conspiracy (claim 10), unjust enrichment (claim 11), and usurpation of corporate

25

26   _____

27          [23] Although the court has entered default against Dean Goodridge and Towne or Country
     Smokey Point, Inc. (Dkt. ## 144, 149), the Tribe has not moved for default judgment.

authority (claim 13).  The Tribe is ORDERED to SHOW CAUSE no later than May 10, 2013, why the court's ruling with respect to the RICO claims and civil conspiracy (claims 1, 2, and 10) should not also be applied to Ms. Schroedl.

Dated this 17th day of April, 2013.

The Honorable Richard A. Jones
United States District Judge

ORDER - 26